GARRETT v. FAUBUS, GOVERNOR.

5-1824

Concurring opinion delivered April 27, 1959.

CARLETON HARRIS, Chief Justice. The purpose of this concurrence is to state my own views relative to the Act here in question. My decision as to the validity of Act 4 is based purely and simply upon the State's police power. The right of the State to enact legislation as a means of protecting the health and safety of its citizens, is so well recognized as to really need no citation of authority, and this is true with reference to emergency legislation, though the legislative act may be in conflict with a constitutional provision. As stated in *Corpus Juris Secundum,* Vol. 16, Sec. 195, page 945:

"Legislation may be enacted under the police power, in seasons of emergency, which would not be appropri-

ate at other times, and such legislation is not invalid merely because it necessarily works a hardship on some individuals for a period of limited duration; but emergency does not justify destruction. Emergency legislation ordinarily contains a declaration that an emergency exists which is causing widespread distress to a large portion of the population with resulting danger to health, safety, or morals of the public generally, but the mere legislative declaration does not of itself create an emergency which will warrant the legislation. The actual existence of the emergency and not the limitation of the law's operation to a prescribed period, gives validity to an exercise of the police power, and, when the emergency ceases to exist, the operation of the statute will be arrested, even though the prescribed term of its operation may not then have expired.''

This doctrine has been followed in any number of cases, one of the most celebrated being *Home Building & Loan Ass'n* v. *Blaisdell,* 290 U. S. 398, 78 L. Ed. 413, 54 S. Ct. 231, which case is cited in various decisions from state courts, including our own. The background is as follows. In 1933, this nation was in the throes of a terrible economic depression, and people who had mortgaged their homes, unable to pay the indebtedness for which the mortgages had been given were losing their property through foreclosure proceedings. Various state legislatures enacted legislation designed to prohibit immediate foreclosures, and thus protect citizens from losing their homes. Among other states which enacted such legislation were Arkansas, Arizona, and Minnesota. The acts so passed by the General Assemblies of these states were attacked in the courts as unconstitutional, and Act 21 of the Arkansas General Assembly of 1933 was attacked on the ground that it was unconstitutional and void, because it conflicted with Section 17 of Article II of the Constitution of the State of Arkansas,[1] and further, the Act was in conflict with Section 10 of Article I of the Constitution of the United States, which provides that no state shall pass

---

[1]The pertinent part of Section 17 provides: "No bill of attainer, *ex post facto* law, or law impairing the obligation of contracts shall ever be passed."

any law impairing the obligation of contracts. This Court passed upon these contentions in the case of *Reiman* v. *Rawls,* 188 Ark. 983, 68 S. W. 2d 470, and in an Opinion written by the late Mr. Justice MEHAFFY, said:

"It is a matter of common knowledge that the present is a period of great depression, and that land values have decreased until there is practically no market for such property. A home that was worth $2,500 when mortgaged to secure a debt some years ago would not bring at foreclosure sale more than one-fourth of this amount, and in many cases much less. There is not only no market for land, but practically all the banks in the country have failed, and it is impossible to borrow money secured by mortgage or pledge of property, to pay debts, and thousands of people in Arkansas who were making a living prior to the depression have lost their jobs, are without work, and without means of support. Governments are created for the purpose of securing the rights of the citizens, and, if a government, during a period of such depression as we now have, could not protect its citizens, there would be no reason for its existence."

The opinion then quoted from the opinion of the Minnesota Supreme Court in the *Blaisdell case* (which subsequently went to the United States Supreme Court) as follows:

"Emergency laws in time of peace are uncommon but not unknown. Wholesale disaster, financial panic, the aftermath of war, earthquake, pestilence, famine, and fire, a combination of men *or the force of circumstances may, as the alternative of confusion or chaos,*[2] demand the enactment of laws that would be thought arbitrary under normal conditions."

Under the view expressed therein, Act 21 was upheld as valid legislation. See also *Sewer Improvement District No. 1 of Wynne* v. *Delinquent Lands,* 188 Ark. 738, 68 S. W. 2d 80. In the case of *Pouquette* v. *O'Brien,* 55 Arizona 248, 100 P. 2d 979, the same question was before the

---

[2] Emphasis supplied.

court in 1937. In this case, the court refused to grant relief, because it said the emergency no longer existed, and held that the mortgage moratorium acts of 1937 and 1939 were unconstitutional as being in conflict with Section 10, Article I of the Federal Constitution. However, the court, in its language, clearly indicated that the legislation would have been upheld in 1933, and in a rather lengthy opinion, discussed the *Blaisdell* case. Inasmuch as the latter is a very lengthy opinion (consisting, with headnotes, of nearly 51 pages), and the reasoning is summarized quite well in the *Pouquette* case, I quote from the latter in explaining the reasoning of the United States Supreme Court in the former.

"The case is a long one and quotations therefrom sufficient to explain and substantiate our conclusions as to its meaning would extend this opinion to unreasonable length. After a careful analysis of the case and its reasoning, we think it clearly laid down the following principles: (a) Legislation of the kind involved in the various mortgage moratorium acts under consideration unquestionably violates section 10, Art. I of the Federal Constitution referred to. (b) There is implied, though not expressed, within the Federal Constitution a reservation of the police power to the states, which is superior to all specific provisions of that constitution and which may be called into play in periods of great public emergency, and when so called these police powers may temporarily only suspend the exercise of the specific powers or prohibitions of the constitution. As was stated in the *Blaisdell* case: 'Undoubtedly, whatever is reserved of state power must be consistent with the fair intent of the constitutional limitation of that power. The reserved power cannot be construed so as to destroy the limitation, nor is the limitation to be construed to destroy the reserved power in its essential aspects. They must be construed in harmony with each other. This principle precludes a construction which would permit the state to adopt as its policy the repudiation of debts or the destruction of contracts or the denial of means to enforce them. But it does not follow that conditions may not arise in which a temporary restraint of enforce-

ment may be consistent with the spirit and purpose of the constitutional provision and thus be found to be within the range of the reserved power of the state to protect the vital interests of the community. It cannot be maintained that the constitutional prohibition should be so construed as to prevent limited and temporary interpositions * * * *.' The existence of a public emergency justifying the suspension of the ordinary constitutional limitations is primarily for the legislature, but the determination of that branch of the government is not conclusive, and whether a law depending upon the existence of an emergency ceases to operate because the emergency had ceased is always open to judicial inquiry, notwithstanding the legislative declarations. Again and again through the opinion the court emphasizes the fact in varying language that in order to justify legislation like the mortgage moratorium acts there must exist a grave public emergency in the opinion of both the legislative and judicial branches of the government, and that when, in the opinion of the latter, the emergency which justifies the act has passed, of necessity the moratorium ceases to be effective, or, as it may be more emphatically put, becomes unconstitutional so far as future use is concerned.''

The Minnesota Act was held valid in an opinion written by one of our greatest jurists, the late Chief Justice CHARLES EVANS HUGHES, in which the Court held that the emergency legislation was within the reserved power of the state to protect the vital interests of the community, did not violate the contract clause, the due process clause or the equal protection clause of the Federal Constitution, and the Chief Justice commented that a review of the court's decisions showed ''a growing appreciation of public needs and of the necessity of finding ground for a rational compromise between individual rights and public welfare.'' The opinion cited numerous United States Supreme Court decisions in support thereof.

It would therefore seem to me that the only question is whether the situation that existed in Little Rock in September, 1958, was sufficiently inimical to the public safety and welfare to justify the legislation here in-

volved. In reaching a conclusion as to this matter, the Court will, of course, take judicial note of the conditions that existed at Central High School during the '57-'58 school year. In commenting upon this situation, I do not primarily refer to the chaotic conditions existing outside the building, *i.e.,* the crowds that had gathered in protest. I mainly have reference to those conditions that existed inside the school, and which were a daily part of student life. Let it first be said, that as far as I know, this is the first time in the history of this nation that troops have patrolled the halls or corridors of a school. I have divers times deliberated as to just how much education a teen-age boy or girl could acquire under such circumstances, and in addition, the frequent threat of bombings, and the systematic search through the lockers and other school property for possible bombs. Conditions could not have been more abnormal, and I am persuaded that the average student could not but be adversely affected by such tense and unusual conditions.

With reference to the Governor's proclamation closing the schools, wherein it is stated "Domestic violence within the Little Rock School District is impending * * *", the attorney who filed with this Court a very fine *amicus curiae* brief, stated: "There is no proof whatever in the record to sustain this determination." I do not agree. No better criterion could be found than what had already happened. The very fact that the Federal Government deemed it necessary to place troops within the school, speaks louder than a thousand words. I need no better evidence than that the Federal authorities themselves recognized such an emergency as had not heretofore existed, else the troops would not have been sent, or would have been withdrawn once the crowds had melted away. To the contrary, such troops remained for the full school term of nine months, clear through graduation. However, this was not the end. At the time school was due to reopen, the Government sent in from over the county, various United States Marshals, and recruited and trained several dozen special deputy marshals to apparently perform the same duties that had previously been performed by the military. There, of course, was

no occasion to recruit this force unless its use was contemplated. As stated in 16 C. J. S., Sec. 185:

"In the exercise of the police power legislatures may enact all laws necessary for the preservation of the rights of person and property from unlawful violence and disorder and the maintenance of good order throughout the state. *Threatened disorders are equally subject to the police power as are actual disturbances of the public peace.*[3]

I cannot even remotely understand, nor comprehend, how any individual could contend that conditions were not such as required the use of the State's police power for the purpose of maintaining peace, good order, and the safety of the students of the senior high schools of Little Rock; in fact, I do not consider it necessary that the situation reach the proportions, or magnitude, **herein** pointed out, before such legislation would be justified.

This Court has previously, even without the conditions herein cited, given the Legislature great leeway in controlling the subject of education. For instance, in *Krause* v. *Thompson,* 138 Ark. 571, 211 S. W. 925, the validity of a statute was questioned which provided for the consolidation of three school districts, and further provided:

"Until such time as the patrons of Pittsburg School District No. 41 and Oakland Special School District No. 19 which are hereby annexed to Lamar Special School District No. 39, shall by a majority petition request their discontinuance, public schools shall be taught in each for a period not exceeding seven months during each year at the places where schools have heretofore been taught and during such seasons as the patrons or a majority thereof may desire, and . . . teachers shall be employed upon the recommendation of a majority of the patrons of each school and shall be paid the same salary as teachers in the public schools of Lamar are paid for like or similar services, * * * ."

This Court, in an opinion by the late Chief Justice Mc-Culloch, said:

---

[3] Emphasis supplied.

"The Statute is assailed in the first place on the ground that it violates section 1, article 14 of the Constitution which pledges the State to 'maintain a general, suitable and efficient system of free schools, whereby all persons in the State between the ages of six and twenty-one years may receive gratuitous instruction.' If this section applies at all to the arrangement and management of school districts, it certainly does not hamper the Legislature in its control over that subject. We have frequently held that the legislative control over the organization of school districts and changes therein is supreme."

Several cases substantiating this statement are then cited.

It is asserted by counsel in the *amicus curiae* brief, that Act 4 was not emergency legislation, and the fact that an election is called for, which would be determinative of whether the schools should be reopened, is proof of that fact. May it simply be said that I consider subsection (b) of Section 1 (which calls for the election), to be mere surplusage. It adds nothing to the power given the Governor to close a school, and that authority is fully effective without the provision, or the subsequent provisions relating to the election. The gravamen of the attack on Act 4 is the authority given the Governor to *close* schools—not those provisions relating to the reopening of same.[4] A discussion, therefore, of the validity of those sections is unnecessary to a determination of the issue before us.

I feel that much could be added in support of the position herein taken, but to say more would only unduly prolong the opinion. This case has given me considera-

---

[4] Even if these portions of the Act be considered invalid, Act 4 contains a severance clause, Section 5, which recites that if any section or provision shall be held unconstitutional, such holding shall not affect the remainder of the Act. The late Justice Frank Smith, in a concurring opinion in the *Reiman* case, said: "However, act 21 and much similar legislation passed at the same session of the General Assembly manifests the purpose to accord the debtor the greatest indulgence which may be granted, and it is, therefore, reasonably certain that the legislation would have been enacted even though Section 2 were eliminated. It is well settled that the unconstitutional portion of a statute may be stricken out without impairing the effect of the remainder where the provisions are wholly independent and it can be seen that the lawmakers would have enacted the remaining part of the statute * * *."

ble concern, because of my deep-seated belief in public education. Perhaps that belief is, to some extent, predicated upon, and influenced by, the knowledge that except for our public school system, I should probably have found it most difficult to obtain an adequate elementary or secondary school education. I am convinced that the same is true with reference to thousands of my fellow citizens. It has thus been personally difficult for me to reach this decision, but I always come back to the same thought, *viz.*, that education, under the conditions heretofore enumerated, cannot, even under the most elastic and flexible construction of the words, be considered "suitable" or "efficient" as provided by Article 14, Section 1, of our Constitution. The enthusiasm and energy of youth, which is used to such good advantage for the acquirement of knowledge in happy surroundings, may well be stifled in an environment of fear and restraint.

To sum up and concisely state my views, the Legislature could not, in the face of the provisions of the State Constitution,[5] enact legislation abolishing the public school system, nor validly pass legislation closing *permanently* part of the schools.[6] But, as herein pointed out, the law is well established that constitutional provisions may be suspended during periods of great emergency, and this principle applies to the requirements of both the Federal and State Constitutions. The United States Supreme Court, in the *Blaisdell* case, held that Section 10, Article 1, of the Federal Constitution was violated by the mortgage moratorium act, there under attack, but nontheless held such legislation valid because of the severe economic depression. In the litigation before us, we are not dealing with an economic crisis nor with financial losses—but, to the contrary, with an emer-

---

[5] Section 1, Article 14: "Intelligence and virtue being the safeguards of liberty and the bulwark of a free and good government, the State shall ever maintain a general, suitable and efficient system of free schools whereby all persons in the State between the ages of six and twenty-one years may receive gratuitous instruction."

[6] Of course, many school districts have been consolidated or annexed under legislative authority, where it appeared consolidation would be beneficial. This procedure has been followed for a long number of years, and has been many times declared valid.

gency far more important—the health, safety and welfare of hundreds of our young people. Can any court logically say (as has been said by the United States Court and this Court) that a suspension of constitutional requirements is right and proper when economy is affected—but not right and proper when the physical and mental well-being of our citizens is at stake? To ask the question is but to answer it.

It is impossible to say for what period of time emergency legislation can remain in effect. The Minnesota Act provided that its provisions should become inoperative a little more than two years after it was approved. The Arizona Court held that the emergency was over some four years after the passage of the original act, though it might possibly have held such legislation invalid earlier, had same been tested. I can only say that when conditions become sufficiently normal that a student can pursue his quest for learning in surroundings conducive to same—then the need for the extraordinary powers herein granted, will have ceased. Until that time, I am forced to conclude that the pertinent provisions of Act 4 are valid and lawful. I fervently hope that time will soon arrive, and I am convinced that a more sympathetic and realistic approach to the problems (engendered by the *Brown* decision) by the appropriate Federal authorities, will hasten that day.